# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Liam W. Hughes, | § | |
|              Plaintiff, | § | |
| | § | CASE NO.  5:22-cv-524 |
| | § | |
| v. | § | |
| | § | |
| Equifax Information Services, LLC; | § | |
| Experian Information Solutions, Inc.; | § | |
| AmeriCredit Financial Services, Inc. d/b/a | § | |
| GM Financial; Rent-A-Center, Inc. d/b/a | § | |
| Acceptance Now; WebBank; Credit | § | |
| Acceptance Corporation; and DOES 1 | § | |
| through 100 inclusive, | § | |
|              Defendants. | § | |

COMES NOW Plaintiff **LIAM W. HUGHES** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.      Defendant AmeriCredit Financial Services, Inc. d/b/a GM Financial ("GM") is not reporting Plaintiff's account accurately as discharged in bankruptcy.

3.      Defendant Rent-A-Center d/b/a Acceptance Now ("Acceptance Now") is not reporting Plaintiff's account accurately as discharged in bankruptcy.

4.      Defendant WebBank ("WebBank") is not reporting Plaintiff's account accurately as discharged in bankruptcy.

5.      Defendant Credit Acceptance Corporation ("Credit Acceptance") is reporting the month the account was repossessed incorrectly, which is patently incorrect and misleading.

6.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

7.      A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

8.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

9.      In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

10.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

11.     Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

12.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

13.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

15.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

16.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

17.     Plaintiff alleges that his GM account was included in his Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

18.     Plaintiff alleges, that despite the fact the account was discharged, GM is reporting the account with a charge off payment status, an outstanding balance, and a past due amount; all of which is patently incorrect and misleading.

19.     GM is not reporting the fact the debt was discharged anywhere on the tradeline on Plaintiff's Equifax credit report. This is patently incorrect and misleading as it appears the debt was not discharged.

20.     Plaintiff alleges that his Acceptance Now account was included in his Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

21.     Despite the fact the account was discharged, Acceptance Now is reporting the account with a charge off payment status and with an outstanding balance, which is patently incorrect and misleading.

22.     Acceptance Now is not reporting the fact the debt was discharged anywhere on the tradeline on Plaintiff's Equifax credit report. This is patently incorrect and misleading as it appears the debt was not discharged.

23.     Plaintiff alleges that his WebBank account was included in his Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

24.     Despite the fact the account was discharged, WebBank is reporting the account with a charge off payment status, which is patently incorrect and misleading.

25.     WebBank is not reporting the fact the debt was discharged anywhere on the tradeline on Plaintiff's Equifax credit report. This is patently incorrect and misleading as it appears the debt was not discharged.

26.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged to be reported on a credit report with a charge off payment status, balance, or past due amount as each of these reflects the debt is still owed and collectible.

27.     Plaintiff alleges that the Credit Acceptance account should report the correct date the repossession occurred. This date is vital to credit reviewers' determination of his creditworthiness because most credit reviewers do not understand how to compensate for an

account reporting an incorrect repossession date. Credit Acceptance's reporting is misleading in a way which prevents him from obtaining credit or rebuilding his credit.

28.     A credit grantor must report the date accurately for which the repossession occurred. It is technically inaccurate to report a "R" for "repossession" on a different date than the one in which it occurred.

29.     When a repossession occurs there is a specific date reported to the bureaus which includes the month and the year. A data furnisher must accurately report the date for which the repossession occurred. It is inaccurate for a data furnisher to report that a repossession occurred several years after the repossession actually occurred. This type of reporting cannot be acceptable under the FCRA as, in addition to being patently incorrect, the incorrect dates compound the derogatory impact as seen by the tally of the total number of notations on a given account which is listed in the account summary.

30.     Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and subscribes thereto.

31.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

32.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

33.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

34.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

35.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management

technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

36.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

37.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

38.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

39.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

40.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

41.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

42.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

43.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

44.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

45.     Each of the five (5) factors is weighted differently by FICO.

46.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

47.      Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

48.      In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

49.      Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

50.      FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

51.      A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

52.      Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.      e-OSCAR**

53.      e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

54.    When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

55.    The ACDV contains codes next to certain data fields associated with a credit file.

56.    When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

57.    When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

58.    For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

## C.    Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

59.    When a consumer files bankruptcy, certain credit reporting industry standards exist.

60.    Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

61.    The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

62.    It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

63.    The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

64.    The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

65.    The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

66.    Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

67.    Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

68.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

69.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

70.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

71.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.      Plaintiff Filed Bankruptcy and Received a Discharge**

72.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on February 25, 2021, in order to repair his creditworthiness and Credit Score.

73.     The Chapter 7 Trustee's Report of No Distribution was entered on April 15, 2021.

74.     Plaintiff's bankruptcy was discharged on June 7, 2021.

75.     GM, Acceptance Now, and Credit Acceptance each received multiple notices throughout the bankruptcy, including the order of discharge.

**E.      Plaintiff's Credit Reports Contain Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

76.     On July 23, 2021, Plaintiff ordered an Equifax credit report and an Experian credit report to ensure proper reporting by Plaintiff's creditors (the "July 23 Credit Reports").

77.     Plaintiff noticed adverse tradelines in his July 23 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

78.     Plaintiff then disputed the inaccurate tradelines regarding the accounts with GM, Acceptance Now, and WebBank via certified mail to Equifax, and with Credit Acceptance via certified mail to Experian on or about August 16, 2021 (the "Dispute Letters").

79.     Plaintiff's Dispute Letters specifically put GM on notice that he filed for Chapter 7 bankruptcy and received a discharge, and as such, his account should not be listed with a charge off payment status or an outstanding balance, and that Plaintiff's account should be updated.

80.     Plaintiff's Dispute Letters specifically put Acceptance Now on notice that Plaintiff filed bankruptcy and received a discharge, and as such, his account should not be listed with a charge off payment status or an outstanding balance, and that Plaintiff's account should be updated.

81.     Plaintiff's Dispute Letters specifically put WebBank on notice that Plaintiff filed bankruptcy and received a discharge, and as such, his account should not be listed with a charge off payment status, and that Plaintiff's account should be updated.

82.     Plaintiff's Dispute Letters specifically put Credit Acceptance on notice that Plaintiff's account inaccurately reported the date in which the repossession occurred, and that Plaintiff's account should be updated.

83.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

84.     Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to GM, Acceptance Now, WebBank, as the data furnishers, via an ACDV through e-OSCAR.

85.     Plaintiff is informed and believes that Experian received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to Credit Acceptance, as the data furnisher, via an ACDV through e-OSCAR.

86.     On March 7, 2022, Plaintiff ordered a second Equifax credit report and Experian credit report to determine if his accounts were updated.

a.      **Inaccuracy – GM**

87.     Despite actual knowledge, GM reported Plaintiff's account, beginning in 455635XXX, to Equifax with a payment status tradeline of "Charge-off", an outstanding balance of "$15,406", a past due amount of "$15,406", and without notation of the bankruptcy discharge. This is patently incorrect as this account was discharged in bankruptcy.

88.     Plaintiff alleges that GM did not investigate whether Plaintiff filed for bankruptcy.

89.     GM did not update the tradeline on the account to reflect that Plaintiff obtained a discharge in bankruptcy.

90.     GM did not update the tradeline on the account to remove the charge off payment status, outstanding balance, or past due amount.

91.     Equifax provided notice to GM that Plaintiff was disputing the inaccurate and misleading information, but GM failed to conduct a reasonable investigation of the information as required by the FCRA.

92.     Based on Plaintiff's dispute and notices received throughout the bankruptcy, GM should have known that Plaintiff received a discharge in his bankruptcy proceedings.

93.     The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received his discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

94.     Plaintiff alleges that GM did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

95.     If GM reviewed such standards, GM would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

96.     GM should have updated the CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy, removed the charge off payment status, outstanding balance, and past due amount.

97.     The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By reporting Plaintiff's account as described herein, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect and misleading.

98.     Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

99.     As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status, outstanding balance, and past due amount reported by GM on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

100.    The lack of investigation and reporting of inaccurate and incomplete information by GM is unreasonable.

**b. Inaccuracy – Acceptance Now**

101.    Despite actual knowledge, Acceptance Now reported Plaintiff's account, beginning in 690000XXXXXXXXXXXXX, to Equifax with a payment status tradeline of "Charge-off", with an outstanding balance, and without notation of the bankruptcy discharge. This is patently incorrect as this account was discharged in bankruptcy.

102.    Plaintiff alleges that Acceptance Now did not investigate whether Plaintiff filed for bankruptcy.

103.    Acceptance Now did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy.

104.    Equifax provided notice to Acceptance Now that Plaintiff was disputing the inaccurate and misleading information, but Acceptance Now failed to conduct a reasonable investigation of the information as required by the FCRA.

105.    Based on Plaintiff's dispute and notices received during the bankruptcy, Acceptance Now should have known that Plaintiff received a discharge in his bankruptcy proceedings.

106.    The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received his discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

107.    Plaintiff alleges that Acceptance Now did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

108.    If Acceptance Now reviewed such standards, Acceptance Now would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

109.    Acceptance Now should have updated the CII to Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy, removed the charge off payment status, and outstanding balance.

110.    The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By continuing to report Plaintiff's account with a payment status

of "Charge-off", it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect.

111. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

112. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and outstanding balance reported by Acceptance Now on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

113. The lack of investigation and reporting of inaccurate and incomplete information by Acceptance Now is unreasonable.

**c.    Inaccuracy – WebBank**

114. Despite actual knowledge, WebBank reported Plaintiff's account, beginning in 636992XXXXXXXXXX, to Equifax with a payment status tradeline of "Charge-off", and without notation of the bankruptcy discharge. This is patently incorrect as this account was discharged in bankruptcy.

115. Plaintiff alleges that WebBank did not investigate whether Plaintiff filed for bankruptcy.

116. WebBank did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy.

117. Equifax provided notice to WebBank that Plaintiff was disputing the inaccurate and misleading information, but WebBank failed to conduct a reasonable investigation of the information as required by the FCRA.

118. Based on Plaintiff's dispute, WebBank should have known that Plaintiff received a discharge in his bankruptcy proceedings.

119. The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received his discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

120.    Plaintiff alleges that WebBank did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

121.    If WebBank reviewed such standards, WebBank would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

122.    WebBank should have updated the CII to Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the charge off payment status.

123.    The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By continuing to report Plaintiff's account with a payment status of "Charge-off", it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect.

124.    Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

125.    As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status reported by WebBank on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

126.    The lack of investigation and reporting of inaccurate and incomplete information by WebBank is unreasonable.

**d.  Inaccuracy – Credit Acceptance**

127.    Despite actual knowledge, Credit Acceptance continued to report Plaintiff's account, beginning in 928726XX, to Experian as though the repossession occurred in January of 2021. This repossession date is patently incorrect as the date for which Credit Acceptance repossession the account occurred in June of 2019.

128.    Credit Acceptance did not update the tradeline to remove the inaccurate date for which the repossession was reported.

129.    The inaccurately reported date of the repossession on the tradeline is misleading as it states the wrong date for which it occurred. This also shows how the inaccurate repossession date reflects as if it happened more recently than it did (i.e., January 2021 vs. June 2019).

130.    Credit Acceptance's reporting is patently incorrect as the more recent repossession date is increasing the recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's creditworthiness. A credit reviewer will deem an account repossession in January of 2021 as more derogatory than a repossession in June of 2019. Since the account was not repossessed January of 2021, this patently incorrect reporting is harming Plaintiff's creditworthiness.

131.    Experian provided notice to Credit Acceptance that Plaintiff was disputing the inaccurate and misleading information, but Credit Acceptance either failed to conduct any investigation or failed to conduct a reasonable investigation of the information as required by the FCRA.

132.    Plaintiff alleges that Credit Acceptance did not review if reporting a repossession on the wrong date complies with the maximum possible accuracy and completeness standard of the FCRA.

133.    If Credit Acceptance reviewed such standards, Credit Acceptance would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

134.    Credit Acceptance's reporting of Plaintiff's account with an incorrect repossession date—as if it occurred more than a year and a half after it actually did—is erroneous derogatory reporting and is increasing recency of the reporting, and therefore, compounding the negative impact on Plaintiff's creditworthiness. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

135.    Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

136.    As payment history (including payment history) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect repossession date reported by Credit Acceptance on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

137.    The lack of investigation and reporting of inaccurate and incomplete information by Credit Acceptance is unreasonable.

**F.      Damages**

138.     Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

139.     As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

140.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by GM. Further, Plaintiff's diminished creditworthiness, resulting from GM's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

141.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Acceptance Now. Further, Plaintiff's diminished creditworthiness, resulting from Acceptance Now's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

142.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by WebBank. Further, Plaintiff's diminished creditworthiness, resulting from WebBank's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

143.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Credit Acceptance. Further, Plaintiff's diminished creditworthiness, resulting from Credit Acceptance's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

144.     GM's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

145.     Acceptance Now's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

146.     WebBank's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

147.     Credit Acceptance's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

148.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Equifax and Experian Each Failed to Assure Credit Reporting Accuracy**

149.    Equifax and Experian (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

150.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the GM account as described herein.

151.    Equifax knew, or should have known, (1) that the GM account was discharged in bankruptcy, and (2) that the account should not have been reported with a payment status of charge off, an outstanding balance, or past due amount as the debt was discharged in bankruptcy. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

152.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Acceptance Now account as described herein.

153.    Equifax knew, or should have known, (1) that the Acceptance Now account was discharged in bankruptcy, and (2) that the account should not have been reported with a payment status of charge off or an outstanding balance as the debt was discharged in bankruptcy. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

154.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the WebBank account as described herein.

155.    Equifax knew, or should have known, (1) that the WebBank account was discharged in bankruptcy, and (2) that the account should not have been reported with a payment status of charge off as the debt was discharged in bankruptcy. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

156.    Had Experian maintained reasonable procedures to assure maximum accuracy, it would have never reported the Credit Acceptance account as described herein.

157.    Experian knew, or should have known, (1) that the Credit Acceptance account was not repossessed in January 2021, and (2) that the account should not have been reported with a repossession in January of 2021 and June of 2019. Further, Experian knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA

158.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the reporting that the CRA Defendants each allowed.

159.    As a result of the CRA Defendants' independent violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

## B.    Willful Violations

160.    The CRA Defendants' independent violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

161.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

162.    To the extent the CRA Defendants do send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

163.    The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

---

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

164.    Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

165.    The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

166.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

167.    As a result of the CRA Defendants' independent violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

168.    The CRA Defendants' independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

169.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

170.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

## (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

## (Against Defendants and Does 1-100)

171.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    GM Failed to Reinvestigate Following Plaintiff's Dispute**

172.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

173.   After receiving notice of the bankruptcy filing, GM sent an AUD or monthly transmission to Equifax reporting the payment status as charged off, with an outstanding balance, a past due amount, and did not report the appropriate CII.

174.   After receiving notice of the bankruptcy discharge, GM continued to report the debt as a charge off, with an outstanding balance, and a past due amount as opposed to discharged.

175.   After receiving the Dispute Letter, GM did not correct the payment status on Plaintiff's Equifax credit report. Instead, GM verified and re-reported the inaccurate account via ACDV to Equifax. Further, GM did not report the correct CII to accurately reflect that the debt was discharged.

176.   The account information reported in an AUD, monthly transmission, or ACDV represents the information of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account was previously charged off, with an outstanding balance, and a past due amount, if at all, it has no bearing on the account's information *after* the account was discharged in bankruptcy.

177.   GM violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

178.   Equifax provided notice to GM that Plaintiff was disputing the inaccurate and misleading information; however, GM either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

179.   Based on Plaintiff's dispute and notices received from the bankruptcy court, GM should have known its account was included and discharged in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

180.   Reporting a discharged debt as charged off is patently incorrect. In addition, this inaccurate reporting also adversely affects credit decisions. Charged off debts are far more injurious to a credit score than a debt discharged and no longer outstanding or owed. This is due to the fact that a charged off debt is still outstanding and collectible whereas a discharged debt is not. Because of this, a consumer with a charge off is deemed less creditworthy than if that same debt was reported as discharged.

181.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, GM's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his Credit Score and obtain new credit.

182.    The lack of investigation by GM, as required by the FCRA, is unreasonable.

**B.    Acceptance Now Failed to Reinvestigate Following Plaintiff's Disputes**

183.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

184.    After receiving notice of the bankruptcy filing, Acceptance Now sent an AUD or monthly transmission to Equifax reporting the payment status as charged off, with an outstanding balance, and did not report the appropriate CII.

185.    After receiving notice of the bankruptcy discharge, Acceptance Now continued to report the debt as a charge off with an outstanding balance as opposed to discharged.

186.    After receiving the Dispute Letter, Acceptance Now did not correct the payment status on Plaintiff's Equifax credit report. Instead, Acceptance Now verified and re-reported the inaccurate account via ACDV to Equifax. Further, Acceptance Now did not report the correct CII to accurately reflect that the debt was discharged.

187.    The payment status reported in an AUD, monthly transmission, or ACDV represents the status of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account was previously charged off, if at all, it has no bearing on the account's pay status *after* the account was discharged in bankruptcy.

188.    Acceptance Now violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

189.    Equifax provided notice to Acceptance Now that Plaintiff was disputing the inaccurate and misleading information; however, Acceptance Now either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

190.    Based on Plaintiff's dispute and notices received from the bankruptcy court, Acceptance Now should have known its account was included and discharged in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

191.    Reporting a discharged debt as charged off is patently incorrect. In addition, this inaccurate reporting also adversely affects credit decisions. Charged off debts are far more injurious to a credit score than a debt discharged and no longer outstanding or owed. This is due to the fact that a charged off debt is still outstanding and collectible whereas a discharged debt is not. Because of this, a consumer with a charge off is deemed less creditworthy than if that same debt was reported as discharged.

192.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Acceptance Now's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his Credit Score and obtain new credit.

193.    The lack of investigation by Acceptance Now, as required by the FCRA, is unreasonable.

**C.    WebBank Failed to Reinvestigate Following Plaintiff's Disputes**

194.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

195.    WebBank sent an AUD or monthly transmission to Equifax reporting the payment status as charged off and did not report the appropriate CII.

196.    After receiving the Dispute Letter, WebBank did not correct the payment status on Plaintiff's Equifax credit report. Instead, WebBank verified and re-reported the inaccurate account

via ACDV to Equifax. Further, WebBank did not report the correct CII to accurately reflect that the debt was discharged.

197.    The payment status reported in an AUD, monthly transmission, or ACDV represents the status of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account was previously charged off, if at all, it has no bearing on the account's pay status *after* the account was discharged in bankruptcy.

198.    WebBank violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

199.    Equifax provided notice to WebBank that Plaintiff was disputing the inaccurate and misleading information; however, WebBank either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

200.    Based on Plaintiff's dispute, WebBank should have known its account was included and discharged in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

201.    Reporting a discharged debt as charged off is patently incorrect. In addition, this inaccurate reporting also adversely affects credit decisions. Charged off debts are far more injurious to a credit score than a debt discharged and no longer outstanding or owed. This is due to the fact that a charged off debt is still outstanding and collectible whereas a discharged debt is not. Because of this, a consumer with a charge off is deemed less creditworthy than if that same debt was reported as discharged.

202.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, WebBank's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his Credit Score and obtain new credit.

203.    The lack of investigation by WebBank, as required by the FCRA, is unreasonable.

**D.       Credit Acceptance Failed to Reinvestigate Following Plaintiff's Disputes**

204.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

205.    Credit Acceptance sent an AUD, or other monthly transmission, to Experian reporting the incorrect date for which the account was repossessed.   Despite them having repossessed the account in June of 2019, Credit Acceptance sent an AUD, or other monthly transmission, to Experian reporting the date for which the repossession occurred as January 2021.

206.    After receiving the Dispute Letter, Credit Acceptance did not correct the repossession date. Instead, Credit Acceptance verified and re-reported the inaccurate repossession date via ACDV to Experian.

207.    Credit Acceptance violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation and re-reporting misleading, inaccurate, and incomplete account information.

208.    Experian provided notice to Credit Acceptance that Plaintiff was disputing the misleading, inaccurate, and incomplete information on its account; however, Credit Acceptance failed to conduct a reasonable investigation as required by the FCRA.

209.    Based on Plaintiff's dispute, Credit Acceptance should have known it was reporting the incorrect repossession date and corrected its inaccurate reporting. Further, Credit Acceptance understands that recency of reporting in the payment history is directly tied to a factor which accounts for the largest portion of a consumer's creditworthiness calculation.

210.    A debt is repossessed on a date certain. If a debt is repossessed, it should report the accurate date for which it occurred. Once a debt is repossessed, the data furnisher should not report that debt being repossessed on a different date, more than one and half years later in this case, than which it occurred. Reporting the incorrect date for which the account was repossessed is patently incorrect.

211.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through

each tradeline of every account listed to obtain context. Therefore, Credit Acceptance's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his Credit Score and obtain new credit.

212.    Based upon the foregoing, Plaintiff alleges Credit Acceptance's reporting of an incorrect repossession date more than one and a half years after the event occurred has a direct adverse effect on Plaintiff's creditworthiness and his ability to obtain credit.

213.    The lack of investigation by Credit Acceptance, as required by the FCRA, is unreasonable.

**E.    Willful Violations**

214.    Plaintiff alleges that GM, Acceptance Now, WebBank, and Credit Acceptance have each reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

215.    Plaintiff further alleges that GM, Acceptance Now, WebBank, and Credit Acceptance have not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

216.    Plaintiff alleges that rather than train their respective employees on accurate credit reporting, FCRA requirements, and industry standards, GM, Acceptance Now, WebBank, and Credit Acceptance's respective employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

217.    In the alternative, GM was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

218.    In the alternative, Acceptance Now was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

219.    In the alternative, WebBank was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

220.    In the alternative, Credit Acceptance was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**F.      The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

221.    Pursuant to 15 U.S.C. § 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the GM, Acceptance Now, and WebBank accounts.

222.    Pursuant to 15 U.S.C. § 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the Credit Acceptance account.

223.    Thus, the CRA Defendants failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

224.    The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

225.    Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

226.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

227.    The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

228.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that GM was not reporting its account at issue correctly.

229.    Had Equifax conducted a proper investigation, it could have updated the GM account by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and removed charge off payment status, outstanding account balance, or past due amount. However, Equifax continued to report the account as described herein.

230.    In the alternative, Plaintiff alleges that Equifax did not send an ACDV to GM to confirm accurate reporting on its account. Despite receiving Plaintiff's Dispute Letters providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conduct an investigation.

231.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Acceptance Now was not reporting its account at issue correctly.

232. Had Equifax conducted a proper investigation, it could have updated the Acceptance Now account by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and removed charge off payment status and outstanding account balance. However, Equifax continued to report the account as described herein.

233. In the alternative, Plaintiff alleges that Equifax did not send an ACDV to Acceptance Now to confirm accurate reporting on its account. Despite receiving Plaintiff's Dispute Letters providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conduct an investigation.

234. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that WebBank was not reporting its account at issue correctly.

235. Had Equifax conducted a proper investigation, it could have updated the WebBank account by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and removed charge off payment status. However, Equifax continued to report the account as described herein.

236. In the alternative, Plaintiff alleges that Equifax did not send an ACDV to WebBank to confirm accurate reporting on its account. Despite receiving Plaintiff's Dispute Letters providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conduct an investigation.

237. Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that Credit Acceptance was not reporting its account at issue correctly.

238. Had Experian conducted a proper investigation, it could have updated the Credit Acceptance account by removing the incorrect repossession date. However, Experian continued to report the account as described herein.

239. In the alternative, Plaintiff alleges that Experian did not send an ACDV to Credit Acceptance to confirm accurate reporting on its account. Despite receiving Plaintiff's Dispute Letters providing notice of the inaccuracies, Experian did not delete or correct the tradeline or conduct an investigation.

240. The CRA Defendants, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

241.    In the alternative, if the CRA Defendants deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), the CRA Defendants failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from either of the CRA Defendants, Plaintiff alleges each of the CRA Defendants deemed his Dispute Letters valid, and thus triggered the CRA Defendants' independent obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which each failed to comply.

**THIRD CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))**

**(Against Defendants and Does 1-100)**

242.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Review and Consider all Relevant Information**

243.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

244.    The CRA Defendants' independent violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

245.    The CRA Defendants' independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

246.    In the alternative, the CRA Defendants were negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

247.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

248.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

249.    The CRA Defendants violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

250.    The CRA Defendants' independent violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

251.    The CRA Defendants' independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

252.    In the alternative, the CRA Defendants were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

253.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### PRAYER FOR RELIEF

254.    WHEREFORE, Plaintiff prays for judgment as follows:

a.    For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.    Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.    Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.    Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.  For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f.  For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: May 23, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: May 23, 2022                    _/s/ Kyle Schumacher_
                                        Kyle Schumacher
                                        Attorneys for Plaintiff